# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MICHAEL W. DAY,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00044 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

The plaintiff, Michael W. Day, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify

a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." " *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Day protectively filed his application for DIB on August 16, 2007, alleging disability as of January 19, 2007, based on back, knee and heel pain, depression, anxiety and memory and concentration problems. (Record, ("R."), at 114-15, 134, 161, 165.) The claim was denied initially and upon reconsideration. (R. at 61-63, 67-69, 73-75, 77-78.) Day then requested a hearing before an administrative law judge, ("ALJ"). (R. at 79.) The ALJ held a hearing on January 29, 2009, at which Day was represented by counsel. (R. at 28-56.)

By decision dated February 27, 2009, the ALJ denied Day's claim. (R. at 10-27.) The ALJ found that Day met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010.[1] (R. at 12.) The ALJ also found that Day had not engaged in substantial gainful activity since January 19, 2007, the alleged onset date. (R. at 13.) The ALJ found that the medical evidence established that Day suffered from severe impairments, namely obesity, lumbar degenerative disc disease, bilateral knee problems and anxiety and depression, but she found that Day did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 19.) The ALJ also found that Day had the residual functional capacity to perform simple, routine, repetitive light work.[2] (R. at 20-21.) The ALJ found that Day would be

---

[1] The relevant time period under review in this matter is from January 19, 2007, Day's alleged disability onset date, to December 31, 2010, Day's date last insured.

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

limited in his ability to push and pull with his lower extremities; would be prohibited from more than occasional climbing of ramps and stairs, balancing, kneeling, crawling, stooping and crouching; would require a sit/stand option; would be prohibited from working in extremely cold temperatures or around hazardous machinery, unprotected heights or vibrating surfaces, and he could not climb ladders, ropes and scaffolds. (R. at 21.) Thus, the ALJ found that Day was unable to perform his past relevant work as a log scaler and sawmill supervisor. (R. at 25.) Based on Day's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Day could perform, including jobs as a mail clerk, a small parts assembler and an order clerk. (R. at 25-26.) Thus, the ALJ found that Day was not under a disability as defined under the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2010).

After the ALJ issued her decision, Day pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-5.) Day then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). This case is before the court on Day's motion for summary judgment filed January 26, 2011, and on the Commissioner's motion for summary judgment filed February 24, 2011.

## II. Facts

Day was born in 1962, (R. at 33, 114), which classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and

vocational training in mine maintenance. (R. at 33-34.) Day has past relevant work as a log yard supervisor and log scaler. (R. at 34.)

In rendering her decision, the ALJ reviewed records from Wise County Public Schools; Wellmont Bristol Regional Medical Center; Dr. Christopher M. Basham, M.D.; Dr. Charles Gaines, D.O.; Dr. Rebekah C. Austin, M.D.; Dr. Daniel Simpson, M.D.; Wise County Behavioral Health Services; Dr. William M. Platt, M.D.; Dr. J. Travis Burt, M.D.; Recovery Associates; Dr. Mark M. Taylor, M.D.; Dr. Kevin Blackwell, D.O.; Dr. Thomas Phillips, M.D., a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Ernest Atella, D.O., a state agency physician; Dr. John Parker, M.D., a state agency physician; Richard G. Salamone, Ph.D., a licensed clinical psychologist; Richard J. Milan Jr., Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; and Stone Mountain Health Services. Day's attorney also submitted records from Cardiovascular Associates, Robert S. Spangler, Ed.D., a licensed psychologist; and Dr. Basham to the Appeals Council.[3]

On April 20, 2005, Day was seen at Medical Associates of Southwest Virginia for complaints of right ankle pain, chronic back pain, anxiety and depression. (R. at 219-20.) Dr. Mark M. Taylor, M.D., reported that Day's examination was normal. (R. at 219.) Day's back had good range of motion. (R. at 219.) On October 12, 2005, Day complained of bilateral knee and ankle pain, neck and back pain, insomnia and fatigue. (R. at 217.) X-rays of Day's knees showed

---

[3] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

mild degenerative arthritic changes of the medial compartments of both knees. (R. at 225.) On June 15, 2006, Dr. Christopher M. Basham, M.D., saw Day for his complaints of depressed mood, insomnia, low back pain and left knee pain. (R. at 215.) X-rays of Day's left knee showed minimal arthritic changes. (R. at 215.) Day reported that Oxycontin provided significant pain relief. (R. at 215.) On July 31, 2006, Day reported that his back pain and insomnia were "somewhat better" since taking Neurontin. (R. at 212.)

On February 27, 2007, Day reported that he was collecting unemployment benefits and that he had filed for disability. (R. at 300.) Day reported a depressed mood related to difficulty sleeping and being off work. (R. at 300.) Dr. Basham discussed treatment options with Day, who wished to avoid surgery, and completed disability forms indicating that Day could not work on a full-time basis. (R. at 300, 309-11.) Dr. Basham reported that Day could occasionally lift and carry items weighing up to 20 pounds, and frequently lift and carry items weighing up to 20 pounds. (R. at 309-11.) Dr. Basham reported that Day could stand and/or walk less than two hours in an eight-hour workday and that he could sit for less than six hours in an eight-hour workday. (R. at 309-10.) He reported that Day's ability to push and/or pull with his lower extremities was limited. (R. at 310.) Dr. Basham reported that Day should never climb, balance, kneel, crouch, crawl or stoop. (R. at 310.) No manipulative, visual or environmental limitations were noted. (R. at 310-11.) On August 23, 2007, Day reported that he continued to have difficulty with arthritis pain and depression. (R. at 456.) On October 25, 2007, Day continued to report depression. (R. at 455.)

On January 25, 2010, Dr. Basham completed a medical assessment indicating that Day could occasionally lift and/or carry less than 20 pounds and frequently lift and/or carry less than 10 pounds. (R. at 702-04.) He indicated that Day could stand and/or walk a total of two hours in an eight-hour workday and that he could do so for less than one hour without interruption. (R. at 702.)  Dr. Basham reported that Day could sit for up to six hours in an eight-hour workday and could do so for less than one hour without interruption. (R. at 703.) He reported that Day should never climb, stoop, kneel, balance, crouch or crawl. (R. at 703.) No other physical limitations were noted. (R. at 703-04.) Dr. Basham reported that Day would be absent from work more than two days a month as a result of his impairments. (R. at 704.)

Day received treatment and counseling from Wise County Behavioral Health Services from 2007 through 2009 for anxiety, depression and opiate addiction with Suboxone. (R. at 688-90.) Day began using opiates following a work-related injury to his back in 1997. (R. at 688.) On March 23, 2007, Day was diagnosed with a depressive disorder, not otherwise specified, and opiate dependence. (R. at 332.) It was reported that Day had a then-current Global Assessment of Functioning, ("GAF"), score,[4] of 40.[5] (R. at 332.) On April 5, 2007, Day reported that he no longer needed services. (R. at 325.) On November 26, 2007, Day was diagnosed with severe major depressive disorder and opiate dependence. (R. at 471-79.) His

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.)

[5] A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

then-current GAF score was assessed at 45,[6] with his highest score during the previous six months being 50. (R. at 471.) On December 6, 2007, Day was diagnosed with single episode of major depressive disorder with mild psychotic features exacerbated by back pain, opiate dependence and a history of alcohol dependence in remission for 15 years. (R. at 483.) On January 17, 2008, Day was alert, oriented, calm and cooperative. (R. at 480-81.) There were no signs of cognitive problems, specifically with concentration. (R. at 480.) Dr. Jennifer Wisdom-Schepers, M.D., reported that she felt like Day was "seeking benzodiazepines." (R. at 480.)  She diagnosed anxiety, not otherwise specified, possibly due to depression. (R. at 481.) On February 13, 2008, Day's mood was less depressed, and his affect reflected his improved mood. (R. at 495.) On February 19, 2008, Day reported that his medication was helping. (R. at 494.) On June 12, 2008, Day reported a decrease in his symptoms of depression. (R. at 547.) On September 10, 2008, Day noted a "big difference with Suboxone treatment." (R. at 530.) He reported that he felt less anxious and irritable and had improved concentration. (R. at 530.) On October 16, 2008, Day reported that he was doing well and that his memory and concentration were stable. (R. at 521.) On October 29, 2008, Day again reported that he was doing better. (R. at 519.) On January 7 and 14, 2009, it was reported that Day appeared to be doing well on his medication. (R. at 603-04.) On June 25, 2009, Day was diagnosed with dysthymic disorder, pain disorder and opiate dependence, and a personality disorder was ruled out. (R. at 643.) His then-current GAF score was assessed at 40. (R. at 643.)

---

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

On January 2, 2007, an MRI of Day's lumbar spine showed mild multilevel degenerative changes, most severe at the L4-L5 level with a moderate degree of foraminal stenosis on the right. (R. at 264-65, 288-89, 349-50, 414-16.) A CT scan of Day's lumbar spine showed a broad-based annular fiber disruption at the L3-L4, L4-L5 and L5-S1 levels, but no focal areas of extruded nucleus was noted. (R. at 260-61, 281-82, 342-43, 406-07.)

On January 2, 2007, Day reported to Dr. William M. Platt, M.D., that he continued to work and had to bend for a significant portion of the day. (R. at 228, 287, 348, 413.) Dr. Platt refused to increase Day's medication and recommended that he continue with the restrictions previously recommended by Dr. J. Travis Burt, M.D. (R. at 228, 287, 348, 413.) He noted that Day would have to make changes in his job and other activities and consider surgical fusion. (R. at 228, 287, 348, 413.) On January 25, 2007, Dr. Platt performed a disckogram, which demonstrated a mechanically positive L5-S1 disc. (R. at 259, 279, 340, 404.) On February 13, 2007, Day reported that he did not want to pursue surgery. (R. at 275, 336, 400.) He noted that his symptoms had decreased since he stopped working and he wanted to taper his narcotic medications with the use of a patch. (R. at 275, 336, 400.) Dr. Platt agreed to assist Day taper his medications. (R. at 275, 336, 400.)

On January 17, 2007, Dr. Burt reported that Day was neurologically intact with a "bit" of an antalgic gait, slightly stooped forward. (R. at 227, 285, 346, 410.) Dr. Burt opined that Day should limit his work activities to no lifting of items weighing greater than 40 pounds and no repetitive standing, stooping, twisting or bending. (R. at 227, 285-86, 346-47, 410-11.) On January 31, 2007, after

reviewing the results of Day's disckogram, Dr. Burt recommended a lumbar fusion, scheduled an appointment with a surgeon and gave him a work excuse until the end of the postoperative period. (R. at 226, 276-77, 337-38, 401-02.) The record does not contain any evidence showing that surgery was performed on Day.

On March 17, 2007, Day was admitted to Indian Path Pavilion under the care of Dr. Charles Gaines, D.O., for treatment of depression, thoughts of suicide, polysubstance dependence and withdrawal. (R. at 313-21.) Upon admission, Day stated that he wanted to "get off all medications and see if I can do without them." (R. at 319.) Upon admission, Day's GAF was assessed at 20.[7] (R. at 313.) Upon discharge, Day's GAF score was assessed at 65.[8] (R. at 313.) His diagnosis at discharge was depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, opiate dependence and withdrawal. (R. at 313.)

Day participated in the Suboxone therapy program at Recovery Associates from March 24, 2007, through April 20, 2007. (R. at 352-56.)

On May 17, 2007, Dr. Kevin Blackwell, D.O., examined Day at the request of Disability Determination Services. (R. at 358-61.) Day reported that he had suffered persistent back pain since 1997. (R. at 358.) He stated that he had weakness and instability in his left leg. (R. at 358.) Dr. Blackwell reported that

---

[7] A GAF score of 11-20 indicates that the individual poses "[s]ome danger of hurting self or others … OR occasionally fails to maintain minimal personal hygiene … OR gross impairment in communication…." DSM-IV at 32.

[8] A GAF score of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Day had good mental status and did not appear to be in any acute distress. (R. at 360.) Day had a symmetrical and balanced gait. (R. at 360.) Upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 360.) Grip strength and fine motor movement were normal. (R. at 360.) Dr. Blackwell diagnosed borderline hypertension, chronic low back pain, bilateral knee pain and left heel pain. (R. at 360.) Dr. Blackwell opined that Day could maximally lift items weighing up to 35 pounds and frequently lift items weighing up to 15 pounds. (R. at 361.) He opined that Day could stand for four hours in an eight-hour workday, assuming positional changes every 30 minutes, or sit for six hours in an eight-hour workday, assuming positional changes every 30 minutes. (R. at 361.) Dr. Blackwell opined that, although he preferred that Day did not bend or stoop, he could do so for less than one-third of the day. (R. at 361.) Day could kneel or squat one-third of the day or less. (R. at 361.) Dr. Blackwell noted no limitation in hand usage, including fine motor movement. (R. at 361.) He opined that Day could not perform repetitive stair stepping or climbing, including ladders, and that he could not work around temperature extremes. (R. at 361.)

On June 1, 2007, Dr. Thomas Phillips, M.D., a state agency physician, reported that Day had the residual functional capacity to perform light work. (R. at 362-68.) He reported that Day could frequently climb and balance and occasionally stoop, kneel, crouch and crawl. (R. at 364.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 364-65.) This assessment was affirmed by Dr. Ernest Atella, D.O., another state agency physician, on June 6, 2007. (R. at 386-87.)

On June 5, 2007, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a mental assessment indicating that Day was moderately limited in his ability to maintain attention and concentration for extended periods. (R. at 369-71.) He found that Day had no significant limitations in the remaining work-related areas. (R. at 369-70.) Leizer opined that Day could perform the mental demands of simple and unskilled work. (R. at 371.) This assessment was affirmed by Dr. John Parker, M.D., another state agency physician, on June 16, 2007. (R. at 390-91.)

That same day, Leizer completed a Psychiatric Review Technique form, ("PRTF"), indicating that Day suffered from an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 372-85.) Leizer opined that Day had no restriction of his activities of daily living and no difficulties in maintaining social functioning. (R. at 383.) He opined that Day had mild difficulties in maintaining concentration, persistence or pace. (R. at 383.) Leizer opined that Day had experienced one or two episodes of decompensation. (R. at 383.) This assessment was affirmed by Dr. Parker on June 16, 2007. (R. at 388-89.)

On September 11, 2007, Richard G. Salamone, Ph.D., a licensed clinical psychologist, evaluated Day. (R. at 423-27.) Salamone diagnosed depressive disorder, not otherwise specified, panic disorder without agoraphobia and extensive and advance degenerative disc disease and facet arthropathy and associated chronic pain by history. (R. at 426.) He also noted the need to rule out major depressive disorder. (R. at 426.)

On October 19, 2007, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a mental assessment indicating that Day was moderately limited in his ability to maintain attention and concentration for extended periods. (R. at 428-29.) He found that Day had either no limitation or no significant limitations in the remaining work-related areas. (R. at 428-29.) Milan opined that Day could perform the mental demands of simple and unskilled work. (R. at 430.)

That same day, Milan completed a PRTF indicating that Day suffered from an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 431-45.) Milan opined that Day had no restriction of his activities of daily living and mild difficulties in maintaining social functioning. (R. at 441.) He opined that Day had moderate difficulties in maintaining concentration, persistence or pace. (R. at 441.) Milan opined that Day had not experienced any episodes of decompensation. (R. at 441.)

On October 19, 2007, Dr. Robert McGuffin, M.D., a state agency physician, reported that Day had the residual functional capacity to perform light work, limited by an occasional ability to push and pull with the lower extremities. (R. at 446-54.) He reported that Day could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 448.) No manipulative, visual or communicative limitations were noted. (R. at 448-49.) Dr. McGuffin indicated that Day should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 449.)

On December 4, 2007, Dr. Rebekah C. Austin, M.D., examined Day for his complaints of lumbar pain and left lower extremity pain, numbness, weakness and tingling. (R. at 515-18.) Dr. Austin reported that Day appeared to be in mild

distress due to pain. (R. at 516.) Day ambulated with mild flexion at the waist. (R. at 516.) Dr. Austin noted tenderness of Day's lower lumbar spine. (R. at 516.) Dr. Austin reported that Day appeared to be mildly depressed. (R. at 517.) Dr. Austin diagnosed lumbar degenerative disc disease throughout, but most pronounced at the L3-L4, L4-L5 and L5-S1 levels; chronic low back pain; left leg pain; and left lower extremity numbness. (R. at 517.) Continued observation and conservative treatment versus surgical intervention was discussed. (R. at 517.) Dr. Austin noted that Day could not return to work. (R. at 517.)

On January 18, 2008, Day presented to Stone Mountain Health Services for complaints of hypertension. (R. at 586-89.) Torry Taylor, N.P., a nurse practitioner, reported that Day was alert and oriented. (R. at 587.) Day had decreased range of motion of the waist. (R. at 588.) He had full range of motion of the neck, hands, wrists, elbows, shoulders, hips, knees and ankles. (R. at 588.) He had a smooth and steady gait. (R. at 588.) Taylor diagnosed hypertension. (R. at 588.) On February 15, 2008, Day reported that his symptoms of anxiety and depression were better controlled. (R. at 583.) On November 25, 2008, Day reported that he felt "much better." (R. at 573.) Day reported that he was receiving Suboxone treatment and that he continued to feel better on a daily basis with it. (R. at 573.) Day reported that his pain was "much better controlled." (R. at 573.) He also reported that his symptoms of anxiety and depression were better controlled. (R. at 573.) Day reported that overall he was doing well. (R. at 573.)

On July 15, 2009, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Day at the request of Day's attorney. (R. at 693-97.) Day seemed socially confident, but depressed. (R. at 693.) Day demonstrated good

concentration during the first hour, but his concentration was erratic afterwards, secondary to depression and discomfort. (R. at 693.) Spangler diagnosed moderate depressive disorder, not otherwise specified; moderate, chronic dysthymic disorder, late onset; mild anxiety disorder, not otherwise specified; prescription opiate dependence, one year full remission by report; alcohol abuse, full remission; and nicotine dependence. (R. at 697.) Spangler assessed Day's then-current GAF score at 55. (R. at 697.) Spangler reported that Day's prognosis was guarded and recommended that Day continue treatment for a period to exceed 12 months. (R. at 697.)

Spangler completed a mental assessment indicating that Day had a limited, but satisfactory, ability to follow work rules, to use judgment and to maintain attention and concentration.[9] (R. at 698-700.) He reported that Day had a seriously limited ability to maintain attention and concentration, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 698-99.) Spangler reported that Day had a limited, but satisfactory, ability to a seriously limited ability to relate to co-workers, to deal with the public, to interact with supervisors, to function independently and to maintain personal appearance. (R. at 698-99.) He reported that Day had no useful ability to deal with work stresses, to understand, remember and carry out complex or detailed instructions and to demonstrate reliability. (R. at

_____

[9] Spangler marked Day's ability to maintain attention and concentration as "1 good" and "2 fair." (R. at 698.) Spangler reported that Day had mild to erratic concentration, with his ability to concentrate becoming "moderate" after the first hour. (R. at 698.) It is assumed that Spangler intended to indicate that Day had a "good" or limited, but satisfactory, ability to maintain attention and concentration for one hour and a "fair" or seriously limited ability to maintain attention and concentration subsequent to the first hour.

698-99.) He also reported that Day would be absent from work more than two days a month. (R. at 700.)

On July 18, 2008, Dr. Larry Foster, M.D., performed a sleep study, which was negative for sleep apnea. (R. at 621.) Dr. Foster reported that Day had abnormal sleep architecture with marked delay and reduction in the amount of rapid eye movements. (R. at 621.)

On September 24, 2009, Dr. Daniel Simpson, M.D., saw Day for myocardial ischemia. (R. at 617-20.) Dr. Simpson diagnosed atypical chest pain, noting abnormal maximum point of impulse that was suggestive of inferior wall ischemia; borderline diabetes mellitus Type II by history; hyperlipidemia, controlled; and hypertension, controlled. (R. at 617, 619.) On October 15, 2009, Day underwent a left heart catheterization, left ventriculography, coronary angiography and angio seal placement. (R. at 622-23.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Day argues that the ALJ erred by failing to give controlling weight to the findings of his treating physician, Dr. Basham. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Day also argues that the ALJ erred by failing to give appropriate weight to his

testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 9-10.)

As stated above, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

Day argues that the ALJ erred by failing to give controlling weight to the findings of his treating physician, Dr. Basham. (Plaintiff's Brief at 6-9.) Under the regulations, a treating source opinion is entitled to less than controlling weight if it is not supported by medical signs and laboratory findings and is inconsistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(3), (4). The ALJ noted that Dr. Basham's opinion that Day could never stoop and perform most other postural positions was inconsistent with the objective medical evidence and with Day's significant activities of daily living. (R. at 25.)

Dr. Burt released Day from working until after he recovered from back surgery. (R. at 226, 276-77, 337-38, 401-02.) Dr. Burt preoperatively opined that Day could lift and carry items weighing up to 40 pounds without performing repetitive standing, stooping, twisting or bending. (R. at 227, 285-86, 346-47, 410-

11.) Dr. Platt did not place any independent restrictions on Day's ability to work, instead advising him to follow the restrictions recommended by Dr. Burt. (R. at 228, 287, 348, 413.) Dr. Blackwell opined that Day could lift and carry items weighing up to 35 pounds maximally and 15 pounds frequently; stand for up to four hours in an eight-hour workday and sit for six hours in an eight-hour workday, assuming the ability to change position every 30 minutes; not bend or stoop routinely, less than one-third of the day and preferably not to be performed at all; kneel and squat one-third of the day or less; not repetitively stair step or climb; never climb ladders; and no exposure to extreme cold or heat. (R. at 361.) Dr. Austin stated that Day could not work but provided no credible specific work-related functional limitations. (R. at 517.) The state agency physicians opined that Day could perform light work that required no more than occasional stooping, kneeling, crouching or crawling. (R. at 362-68.)

Day's attorney also submitted a report to the Appeals Council from psychologist Spangler which indicated that Day was seriously limited in his ability to make at least some occupational, performance and personal/social adjustments. (R. at 698-700.) Spangler's assessment contradicts the remainder of the opinions relating to Day's mental limitations. Salamone opined that Day was not impaired from a "purely psychological perspective." (R. at 427.) The state agency psychologists opined that Day could perform the demands of simple and unskilled work. (R. at 371, 388-91, 430.) In addition, Day's symptoms of depression and anxiety improved with medication. (R. at 494-95, 519, 521, 530, 547, 573, 583, 603-04.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Based on

this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence.

Day also argues that the ALJ erred by failing to give appropriate weight to his testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 9-10.) Based on my review of the record, I find that the ALJ considered Day's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers....

76 F.3d at 595.

I find that the ALJ reasonably found that Day's subjective complaints of disabling functional limitations were not credible. The ALJ found Day's testimony that he could not perform any work was "not credible," in particular, the ALJ found that Day's allegations regarding his pain symptoms were disproportionate to the objective evidence and were undermined by his activities of daily living. (R. at 22.) The ALJ specifically noted that Day displayed a normal gait despite his complaints of low back pain. (R. at 22.) The ALJ properly considered the objective evidence of record and Day's daily activities in assessing his subjective complaints. (R. at 22-23.) The ALJ found that Day's activities, which included making simple meals; putting dishes in the dishwasher; dusting; raking; helping with his son; watching television; listening to music; driving; shopping; paying bills; visiting family; and attending church, were inconsistent with his alleged inability to perform even light work. (R. at 22-23.) Based on this, I find that the ALJ properly analyzed Day's allegations of pain.

For all of the reasons stated above, I find that substantial evidence supports the ALJ's finding with regard to Day's residual functional capacity, and I recommend that the court deny Day's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Day's residual functional capacity; and

3. Substantial evidence exists to support the ALJ's finding that Day was not disabled under the Act and not eligible for DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Day's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of

the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 26, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE